IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| 3M COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 3-20CV3664-K |
| v. | ) |
| | ) |
| MOONLIGHT MEDICAL SUPPLIES & EQUIPMENT LLC d/b/a QUALITY RESOURCE COMPANY, | ) SEALED / EX PARTE |
| | ) |
| Defendant. | ) |

## DECLARATION OF MICHAEL L. GANNON

I, Michael L. Gannon, hereby declare and state as follows:

1. I am a resident of the State of Minnesota, over twenty-one years of age, and if called to testify to the matters contained herein could do so competently and based upon my personal knowledge.

2. I am Senior Trademark Counsel for 3M Innovative Properties Company ("3M"). The information set forth herein is based on my personal knowledge obtained through the course of my duties at 3M. The information set forth herein is also based on my review of records, documents (including electronic records), and photographs maintained in the regular course of 3M's business, and the Complaint in this lawsuit.

3. I submit this declaration in support of 3M's Motion for Ex Parte Seizure Order, Temporary Restraining Order, and Preliminary Injunctive Relief against Moonlight Medical Supplies & Equipment LLC d/b/a Quality Resource Company ("Moonlight Medical" or "Defendant") in the above-captioned action.

4. For decades, 3M has been a leading provider of personal protective equipment for

healthcare professionals, industry workers and the public. Indeed, 3M is a leading manufacturer of N95 respirators, and has sold N95 respirators in the United States under the 3M brand name for decades.

5.   3M has spent hundreds of millions of dollars in advertising, marketing, and promoting goods and services under its standard-character mark "3M" and 3M design mark **3M** (together, the "3M Marks"). Goods sold under the 3M Marks, including 3M's N95 respirators, generate billions of dollars in annual revenue. The 3M Marks are recognized and well-known in households around the U.S. 3M has been the exclusive source of goods and services offered under the 3M Marks for decades.

6.   Since the COVID-19 outbreak began, the public has become familiar with 3M as a manufacturer of the N95 respirators and other equipment essential to protecting healthcare personnel and workers from exposure to airborne particles, including viruses like COVID-19.

7.   Over the past century, 3M has invested hundreds of millions of dollars in advertising, promoting, offering for sale, and selling its vast array of goods and services under the 3M Marks. During this period, 3M's goods and services offered under its 3M Marks have been the subject of widespread, unsolicited media coverage and critical acclaim. Goods and services offered under 3M Marks also enjoy enormous commercial success, with annual revenues in the billions of dollars.

8.   To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No. 2,692,036, which covers the 3M logo for, inter alia, a "full line of surgical masks, face shields, and respiratory

masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, inter alia, respirators (the "'534 Registration").

9. Attached hereto as **Exhibit 1** is a true and correct copy of the '329 Registration.

10. Attached hereto as **Exhibit 2** is a true and correct copy of the Notice of Acknowledgement of 3M's Declaration of Incontestability of the '329 Registration, which was issued by the United States Patent and Trademark Office (the "PTO") pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.

11. Attached hereto as **Exhibit 3** is a true and correct copy of the '036 Registration.

12. Attached hereto as **Exhibit 4** is a true and correct copy of the Notice of Acknowledgement of 3M's Declaration of Incontestability of the '036 Registration, which was issued by the PTO pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.

13. Attached hereto as **Exhibit 5** is a true and correct copy of the '534 Registration.

14. Attached hereto as **Exhibit 6** is a true and correct copy of the Notice of Acknowledgement of 3M's Declaration of Incontestability of the '534 Registration, which was issued by the PTO pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.

15. Defendant has been a registered Texas corporation since April 2020. Attached hereto as **Exhibit 7** is a true and correct copy of the business organizations inquiry for Moonlight Medical Supplies & Equipment LLC from the Texas Secretary of State website as of December 16, 2020.

16. I first learned of Defendant's sale of counterfeit respirators on September 25, 2020, as a result of 3M's diligent social media and online monitoring for unlawful counterfeiting activity. 3M's monitoring efforts resulted in the discovery of a Facebook post, with images bearing a

"www.moonlight-medical.com" watermark, in which Defendant publicized a "special offer" on 3M N95 1860 respirators. Attached hereto as **Exhibit 8** is a true and correct copy of the Facebook post as of September 19, 2020.

17. I then reviewed Defendant's website where I noticed Defendant's promotion and offer for sale of purported 3M N95 1860 respirators. Based on certain indicators on the packaging, I recognized that the purported 3M N95 1860 respirators in the photos on Defendant's website were counterfeit. Upon determining that Defendant's website showcased apparent counterfeit 3M N95 respirators, I engaged an investigator to make a sample purchase of 20 respirators from Defendant. Upon examination of the samples purchased, I confirmed that the respirators being offered for sale and sold by Defendant were in fact counterfeit. Attached hereto as **Exhibit 9** is a true and correct copy of Defendant's website as of December 16, 2020.

18. Through further engagement of an investigator, I learned that Defendant represented to the investigator that it has an inventory of at least 20,000 3M N95 1860 respirators, which it offered for sale to the investigator at a bulk price of $6.50 per unit. I also learned that Defendant represented to the investigator that it can obtain and will resell 3M 8210 respirators at a price of $4.80 per unit, with an eight- to fifteen-day lead time.

19. On its website, Defendant described itself as a "distributor and manufacturer of Personal Protective Equipment for medical workers, first responders, and the general public." Attached hereto as **Exhibit 10** is a true and correct copy of Defendant's About Us webpage as of December 16, 2020.

20. Despite having only been incorporated months prior, Defendant represented itself to be "one of the leading medical equipment supply providers in the greater Dallas-Ft. Worth area." Defendant also represented that it has sold PPE to medical professionals in the Fort Worth, Texas,

area and received positive customer testimonials. Attached hereto as **Exhibit 11** is a true and correct copy of Defendant's Community Engagement webpage as of December 16, 2020.

21. Defendant's website advertised the sale of 3M respirators, including the "3M N95 1860 Respirator Mask," and Defendant represented that its supply of 3M N95 1860 respirators is "FDA Cleared for use as surgical mask" and that such masks have "99% BFE (Bacterial Filtration Efficiency) according to ASTM F2101." Defendant advertised that the product is "100% Authetic[sic] 3M 1860 Respirator Mask," and offered to sell 20 units for $159.90, which Defendant indicates is a mark down from $199.00. Buyers receive additional discounts if they purchase greater quantities of the item. Attached hereto as **Exhibit 12** is a true and correct copy of Defendant's webpage offering for sale purported 3M N95 1860 respirators as of December 16, 2020. Defendant's website did not advertise any 3M 8210 respirators.

22. Defendant's mark-up is four to six times greater than 3M's listed prices, and the purported list price of $199.00 for 20 units would likewise be vastly above the appropriate pricing:

| Respirator | 3M's Per-Unit Price | Defendant's Per-Unit Price (20 units) | Approximate Markup |
|---|---|---|---|
| 1860 | $1.27 | $8.00 | 530% |
|  |  | Defendant's Per-Unit Price (20,000 units) | Approximate Markup |
| 1860 | $1.27 | $6.50 | 419% |
| 8210 | $1.02-$1.31 | $4.80 | 266-371% |

23. I also viewed a YouTube video that Defendant published, in which Defendant purports to describe the differences between authentic and counterfeit 3M N95 1860 respirators: https://www.youtube.com/watch?v=epNKIwAxSdc&feature=youtu.be. The products in Defendant's video are both counterfeit based on certain indicators on the packaging. The information provided by Defendant about how to identify counterfeits is also wrong and Defendant

5

is therefore cascading dangerous information to even more people.

24. Defendant is not, and has never been, an authorized distributor, vendor, or representative of 3M's products. Defendant also does not have, and has never had, an association or affiliation with 3M. 3M does not—and will not—condone individuals or entities deceptively trading off the fame and goodwill of the 3M name and marks for personal gain. This is particularly true against those who seek to exploit the surge in demand for 3M-brand products during the COVID-19 global pandemic, which already has claimed more than 300,000 lives in the United States and more than a million lives worldwide.

25. Defendant's actions have caused irreparable harm to the 3M brand and have put the public at risk by selling a counterfeit piece of PPE to unwitting consumers and professionals who are fighting this deadly virus.

26. Accordingly, 3M commenced an action against Defendant on December 17, 2020, asserting claims under federal and Texas law for trademark counterfeiting; trademark infringement; unfair competition, including price gouging; false association; false endorsement; false designation of origin; and false advertising.

27. As set forth in 3M's Complaint, 3M can demonstrate that Defendant used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services and is likely to succeed on the merits.

28. 3M has requested a seizure order from this Court. 3M anticipates notifying the United States Attorney for the Northern District of Texas regarding its request, but has not otherwise publicized the requested seizure.

29. 3M has been granted orders for seizure from District Courts in the United States for other Defendants' use of counterfeit 3M marks in connection with the sale, offering for sale, or

distribution of goods or services. *See, e.g.*, *3M Company v. Premium Contractor Solution, LLC*, 3:20-CV-0043 (S.D. Ohio Oct. 30, 2020). As of the date of this Declaration, at least two other courts have granted seizure orders in cases that remain under seal.

30. As set forth in 3M's Motion for Ex Parte Seizure Order, Temporary Restraining Order, and Preliminary Injunctive Relief, 3M can demonstrate that Defendant used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services.

31. It is my sincere belief based on my knowledge of the facts associated with Defendant's actions that immediate and irreparable injury will occur if such seizure is not ordered.

32. Upon information and belief, the matter to be seized will be located at the following locations, which are addresses listed by the company in its filing with the Texas Secretary of State (*See* Ex. 7):

> Moonlight Medical Supplies & Equipment LLC
> 1002 North Central Expressway, Suite 495
> Richardson, Texas 70580
>
> 5151 Headquarters Drive, Suite 260
> Plano, Texas 75024-0022

33. 3M has, in the past, attempted to confront purveyors of counterfeit 3M goods with cease and desist letters, instead of court actions. Repeatedly and consistently, such efforts have been answered with claims that the seller was ignorant to the origins of the products and no longer possesses any such product.

34. Further, in the context of the current COVID-19 pandemic, 3M respirators are in extremely high demand, and any purveyors of this product, whether real or counterfeit, are able to sell the product extremely quickly.

35. Accordingly, it is my sincere belief based on my knowledge of the facts associated with Defendant's actions that Defendant will sell, destroy, move, hide, or otherwise make the

products inaccessible to the court, if 3M were to notify Defendant of the court proceedings.

36. The harm to 3M of denying 3M's request for seizure of the counterfeit products outweighs the harm to the legitimate interests of Defendant. These are medical respirators that need to be seized and secured, lest they are moved and sold to unsuspecting purchasers who then wrongly rely on them for protection to prevent communication of dangerous and potentially deadly viruses.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND ACCURATE BASED UPON MY PERSONAL KNOWLEDGE.

EXECUTED this 16th day of December, 2020 in Dakota County, Minnesota.

Michael L. Gannon